[Crim. No. 21326. May 19, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND MACK, Defendant and Appellant.

COUNSEL

Glen H. Schwartz, under appointment by the Supreme Court, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CLARK, J.**—Defendant was convicted of one count of first degree murder (Pen. Code, §§ 187, 189),[1] six counts of first degree robbery (former §§ 211, 211a) and one count of first degree burglary (§§ 459, 460). He was found to have inflicted great bodily injury upon the victim of one of the robbery counts. (Former § 213.) Execution of sentence as to the robbery and burglary counts was stayed pending appeal and service of sentence as to the murder count, the stay to become permanent upon completion of the murder sentence. The judgment is affirmed.

Police investigation was initiated by a telephone call to Los Angeles Police Officer Gary Zerbey from an informant who, refusing to identify himself, stated there was stolen property—including television sets, cameras, stereo equipment, silverware and guns—in a garage at 6418 South Second Avenue in Los Angeles. The informant further stated the property had been taken in recent burglaries on Eighth Avenue between Slauson and Florence, that five named males were the burglars and that the burglars were preparing to move the stolen property from the garage.

Officer Zerbey determined from police records that property matching the description given by the informant had been taken in recent burglaries in the Eighth Avenue area specified by the informant.

Mark Bowden, who was identified as one of the burglars, lived at the South Second Avenue address. He was known to Officer Zerbey through an investigation, three weeks earlier, of an armed robbery in

---

[1]Statutory references are to sections of the Penal Code unless otherwise noted.

which shots had been fired and a revolver taken in a previous burglary had been recovered. Two of the robbery suspects had escaped. Bowden, a juvenile, had been arrested and then released on the understanding he would return for an interview with Officer Zerbey, an agreement Bowden failed to honor.

Officer Zerbey, accompanied by two officers he had fully briefed, went to the Bowden residence with the intention of questioning Mark and his parents concerning the informant's allegations as well as the earlier robbery, and of seeking the parents' permission to search the family garage. While Officer Zerbey knocked on the front door of the Bowden residence one of the other officers, Lawrence Skiba, stationed himself at the side of the house, in the driveway leading from the street to the garage. As he did so, two males came out the side door of the garage, observed him and ran back inside shouting "Look out! The cops!" Approaching the garage, Officer Skiba heard "multiple voices" within yelling and what sounded like furniture being moved.

Identifying himself as a police officer, Skiba ordered the occupants out of the garage; five males complied. After again ordering anyone remaining inside to come out, Skiba entered the garage to search for additional suspects. It was a "dirty old garage...with a bunch of furniture," including a couch, bed, table and bar, as well as a makeshift loft. While satisfying himself no one remained in the garage, Skiba observed —in plain sight—the stolen property defendant seeks to suppress.

In a previous proceeding, Skiba was held to have acted reasonably in ordering the occupants out of the garage. (*People* v. *Superior Court* (*Bowden*) (1976) 65 Cal.App.3d 511 [135 Cal.Rptr. 306] (hg. den. 23 Feb. 1977.))[2] ▆ We now address a question left unresolved in *Bowden*—whether it was reasonable of Skiba to enter the garage to

---

[2]Defendant was initially tried with his alleged accomplices. That proceeding ended in a mistrial as to defendant because the jury was divided regarding his guilt. Defendant's second trial, the judgment we here review, was severed from the retrial of the other defendants.

Prior to the first trial, a hearing was held on suppression motions made by the five defendants under section 1538.5. The trial judge granted the motions and the People sought review by writ. (§ 1538.5, subd. (o).) In *People v. Superior Court* (*Bowden*), *supra*, 65 Cal.App.3d 511, the Court of Appeal issued a peremptory writ with directions to the trial court to "vacate its order granting the motions to suppress the evidence and thereafter conduct further proceedings for the limited purpose of making factual determinations on the other unresolved issues previously raised by defendants in their motions pursuant to Penal Code section 1538.5. Since a full de novo hearing has been had, additional evidence should be allowed only if the standards set forth in

search for additional suspects. We conclude the officer did act reasonably in entering the garage.

■ The controlling precedent is *People* v. *Block* (1971) 6 Cal.3d 239 [103 Cal.Rptr. 281, 499 P.2d 961]. We began our analysis in *Block* by reiterating the "plain sight" rule—"that 'objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence.' [Citations.]" (6 Cal.3d at p. 243.) "A corollary of the 'plain sight' rule," we continued, "is that 'During a lawful search of premises for persons believed to be in hiding, police officers may seize contraband evidence "in plain sight." [Citations.]'" (*Id.*) The evidence sought to be suppressed in *Block* was observed in plain sight by an officer searching the premises for persons believed to be in hiding. The case turned, therefore, on the reasonableness of his belief.

Noting that the ultimate question was whether the challenged search was a lawful search for additional suspects, we set forth the principles governing the resolution of that question. "As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. [Citation.] And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary. [Citations.]" (*Id.* at p. 244.)

Applying these principles, we concluded the officer acted reasonably in searching for additional suspects. "In the instant case, it seems evident that Officer Galloway had reasonable cause to believe, based upon facts available to him at the time he acted, that additional persons might be on the premises. The presence of six or seven persons downstairs, four of whom bore signs of recent marijuana use, together with the immediate detection of burning marijuana smoke and the discovery

*Madril* v. *Superior Court* (1975) 15 Cal.3d 73 [123 Cal.Rptr. 465, 539 P.2d 33], are satisfied." (*Id.* at p. 524.)

No new evidence was presented in the subsequent proceeding but the unresolved issues were fully argued by counsel. The suppression motion was denied. Since the motion was considered on the evidence presented in the previous proceeding, the one under review in *Bowden*, we have obtained and reviewed the record developed there.

of a smoking marijuana roach and two pipes lying in plain sight on a coffee table reasonably indicated that a 'pot party' was in progress, involving an undetermined number of participants. The lights which illuminated the stairway and upstairs hall justified the further suspicion that other persons might be upstairs who were involved in the offenses charged [fn. omitted], or who might pose a security risk for the arresting officers. Under these circumstances, it was entirely reasonable for Officer Galloway to act as he did." (*Id.* at p. 245.)

This court relied upon *Block* in upholding a search for additional suspects in *People v. Sommerhalder* (1973) 9 Cal.3d 290 [107 Cal. Rptr. 289, 508 P.2d 289]. In *Sommerhalder*, officers investigating murder went to a cabin shared by two suspects with the intention of questioning them and a third suspect believed to be with them. The occupants responded to the officers' knock with gunfire. When the officers returned the fire, four people, including the three suspects the officers had come to interview, emerged from the cabin and gave themselves up. Citing *Block*, this court upheld the officers' entry into the cabin to search for other suspects. The officers did not know whether anyone else remained in the building. The three suspects they had come to question, in addition to a fourth person, had left the cabin. Nevertheless, it was reasonable to believe there might be others inside, either armed or wounded, and the officers had a duty to find out. (9 Cal.3d at p. 305.)

In conclusion, comparison of this case with *Block* and *Sommerhalder* clearly demonstrates Officer Skiba acted properly in entering the garage to search for additional suspects. He did so out of justifiable concern for his own safety. The reasons for his concern were several. He knew Bowden had been arrested for an armed robbery in which shots had been fired and that his accomplices had escaped. He believed these dangerous fugitives might be in the garage. He knew the stolen property alleged to be in the garage included firearms. Therefore, anyone remaining in the garage would have access to deadly weapons. Moreover, he did not know whether the five men who had come out of the garage included all five of the accused burglars. His belief that additional suspects might be found in the garage was, manifestly, amply supported by "specific and articulable facts."

We now consider defendant's contention that the trial court erred in denying his motion to suppress his confessions.

The events culminating in the search of the Bowden garage occurred on 29 August 1975. At that time defendant and the four other suspects were arrested for receiving stolen property. Defendant testified that upon arriving at the police station he was advised of his *Miranda* rights[3] and declined to make a statement. Defendant was released within 48 hours. Investigation of the stolen property found in the Bowden garage led police to believe defendant had committed the acts leading to the present charges. On 5 September 1975, he was rearrested by Los Angeles police officers and taken to a Santa Monica Police Department station where an officer of that department, as well as a Los Angeles officer, again advised him of his *Miranda* rights. Defendant waived his privilege against self-incrimination, describing his criminal activity in tape-recorded and handwritten statements.

Defendant moved to suppress his confessions on three grounds. First, he contended the confessions were the "fruit of the poisonous tree." (See *Wong Sun* v. *United States* (1963) 371 U.S. 471, 485, 487-488 [9 L.Ed.2d 441, 453, 455-456, 83 S.Ct. 407].) Defendant's argument, which he repeats here, proceeded as follows: The evidence found in the Bowden garage was illegally seized because Officer Skiba was not justified in entering the garage to search for additional suspects. The police induced defendant to confess by confronting him with that evidence. Therefore, defendant concluded, his confessions should have been suppressed as products of the allegedly illegal search and seizure. (See *People* v. *Johnson* (1969) 70 Cal.2d 541, 545 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].) The flaw in this argument, of course, is that, as has been explained above, the evidence found in the garage was legally seized.

The second ground of the suppression motion was that the confessions were coerced. Defendant has not pursued this contention on appeal.

■ Finally, defendant contended the confessions should have been suppressed under the authority of *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]. As defendant pointed out, this court's intervening decision in *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108] lends apparent support to defendant's position.

---

[3]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

In *Pettingill* this court summarized *Fioritto* as follows: "There the defendant and two companions were arrested for burglary and taken to the police station. The police gave the defendant the *Miranda* warnings and asked him to sign a waiver of his rights. He refused. The police then confronted him with his two accomplices, who had previously confessed and implicated him. The police again gave the defendant the *Miranda* warnings and renewed their request that he sign the waiver. This time he did so, and confessed to the burglary. [¶] We held that after a defendant has once demonstrated he does not wish to waive his privilege against self-incrimination, the police cannot lawfully subject him to a new round of interrogation even if they repeat the *Miranda* warnings: 'By his refusal to waive his constitutional rights initially, defendant indicated that he intended to assert his rights—the privilege had been *once invoked*—and all further attempts at police interrogation should have ceased.' (*Id.*, at p. 719.) Because the confession was thus obtained in violation of the constitutional privilege, we held its admission in evidence to be prejudicial per se. (*Id.*, at p. 720.)" (21 Cal.3d at p. 238.)

The defendant in *Pettingill* was arrested in Eureka for burglary. Advised of his *Miranda* rights, Mr. Pettingill declined to make a statement. Two hours later, after he had been booked, the defendant was again advised of his *Miranda* rights and again asserted his right to remain silent. Evidence found in a car in which the defendant's companions had been arrested led the Eureka police to believe he might also be involved in burglaries in the Santa Barbara area. Accordingly, a Santa Barbara police officer came to Eureka to investigate this possibility. The officer was informed by Eureka police that the defendant had twice refused to make a statement. Telling the defendant he wished to question him concerning the Santa Barbara burglaries, the officer again advised the defendant of his *Miranda* rights. This time the defendant waived his rights and described the Santa Barbara offenses. Declining to follow the decision of the United States Supreme Court in *Michigan v. Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321], which held that a confession obtained under essentially similar circumstances did not violate the privilege against self-incrimination of the Fifth Amendment to the United States Constitution, a majority of this court held that the defendant's confession was inadmissible under article I, section 15 of the California Constitution. "[T]he *Fioritto* rule, rather than the *Mosley* test, will remain the rule of decision in all state prosecutions in California." (21 Cal.3d at p. 251.)

*Pettingill* is distinguishable. The defendant in that case remained in custody continuously for three days before finally waiving his *Miranda* rights. The significance of this fact was stressed. "Contrary to the People's suggestion, such a delay is not psychologically beneficial or even neutral: the longer an individual is held incommunicado, the greater his incentive to confess so as to end his isolation from family, friends, or counsel. And if during that period—as here—the police not once but three times repeat the *Miranda* warnings and ask if the defendant wants to talk to them, the compulsion to make a statement in order to 'get them off my back' may be well nigh irresistible." (21 Cal.3d at p. 242.)

By contrast, defendant was released on the original charges after he declined to make a statement; he was at liberty for five or six days before he was rearrested on the present charges, readvised of his *Miranda* rights and confessed. During that considerable period the police exerted no pressure whatsoever on defendant to confess. He was entirely free to consult "family, friends, or counsel" concerning the charges he knew, or should have known, would be brought against him once the property found in the Bowden garage was traced to the robberies and murder of which he has been convicted. He knew his rights. He had asserted them when first arrested. In the interim he had an opportunity to carefully consider his predicament and to seek any support needed—personal or professional—to continue asserting his rights, if he so chose. Under the circumstances, his decision to waive his rights must be considered voluntary.

Finally, relying on *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], defendant contends the prosecutor denied him his right under the California Constitution to an impartial jury by exercising peremptory challenges to remove prospective jurors on the sole ground of group bias. As the voir dire in this case was conducted well before *Wheeler* became final, defendant is not entitled to relief under that decision. (*Id.*, at p. 283, fn. 31.)

The judgment is affirmed.

Tobriner, J., Mosk, J., Richardson, J., Manuel, J., and Newman, J., concurred.

BIRD, C. J.—I respectfully dissent for the reasons set forth in the unanimous Court of Appeal opinion below.

## I

"It has long been established that the guideline for assessing the conduct of police officers is that of reasonableness. *People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961], tells us that, '[a]s a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' (Citations omitted.)

"There appears to be no question that these officers could have sought out a magistrate to obtain a search warrant for the garage after the five occupants had been ordered out and arrested. As Officer Skiba admitted, the garage could have been secured while such an effort was made to obtain a search warrant. The record indicates that Zerbey consulted with a supervising officer who came to the scene; the decision was then made to conduct the search and seizure without seeking to obtain a warrant.

"At the time of entry, Skiba was generally aware of what Zerbey's anonymous caller had reported was contained in the garage, including guns; he knew also that occupants had just exited from the garage. The two young black males he first encountered who ran back inside the garage, however, were not armed and were not identified by him as being connected with any specific criminal activity. Five persons exited on his command.

"The crucial question is whether Skiba was acting reasonably in entering the garage for his stated purpose, to determine whether other individuals remained there. No 'hot pursuit' was involved, nor was there any suspicion of narcotic activity. We know of no rule of law which authorizes an officer who has ordered persons out of premises to make a subsequent entry upon those premises to ascertain whether anyone else is there. If such were the rule, dangerous inroads could be made upon the protection afforded to private residences by the simple mechanism

of ordering out the inhabitants and then entering to make sure everyone was out. We conclude that there were no *'specific and articulable'* facts to support Skiba's first entry into the Bowden garage.

"Skiba also testified that he entered the garage in order to protect himself and the other officers from physical harm. His stated fear was that someone might have remained in the garage with a weapon, and that such an armed person would present a danger to him and the other officers. In *People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], 'exigent circumstances' are described as 'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.'

"It is understandable that a police officer may fear assault or worse at any time when he is outside of a building and does not know what is inside of it, particularly in a society where the possession of weapons is widespread, but the reasonableness of the steps he takes pursuant to such fear must be assessed in the context of the constitutional rights of citizens. There were simply no specific facts known to Skiba which supported a belief that an armed person might have remained in the garage after the exit of five occupants. An *unfounded* fear or belief of 'imminent danger to life' (*Ramey, supra,* 16 Cal.3d 263, 276) cannot constitute 'exigent circumstances' to justify a warrantless entry into a citizen's garage.

"Since Officer Skiba had no right to be where he was when he made his plain sight observations, the subsequent search and seizure by Zerbey cannot be justified. The motion to suppress evidence seized from within the garage should have been granted.

[II]

". . . . . . . . . . . . .

"Defendant was initially arrested on August 29, 1975, following his detention upon exiting from the Bowden garage and the officers' search of the garage and seizure of stolen property. This arrest was predicated

on the basis that defendant had received stolen property. He was given the *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) warnings. He invoked his constitutional rights and refused to talk. Defendant was released after being held for two days. He was arrested again on September 5, 1975, by the Santa Monica police and charged with the murder, robbery and burglary offenses set forth in the charging information in the instant case.

"Over appropriate objection, the jury was permitted to hear a transcription of an interview the police had with the defendant on September 5, 1975, at the Santa Monica Police Department. Defendant had been advised of his *Miranda* rights, had waived them and had recounted the events of July 24, 1975; he admitted participating in the crimes involved but denied that he was armed.

"It is defendant Mack's position that his confession resulted from the exploitation by the police of the illegal search of the Bowden garage and the illegal seizure of property from that garage, including the 'Hy Walter' silver cup taken in the burglary of the Walter premises. Hence, argues defendant, his confession is inadmissible as fruit of the poisonous tree. We agree.

"Prior to making his confession, defendant was told by an officer of the Los Angeles Police Department who was at the Santa Monica Police Department that the police had everybody in custody and charged with murder, that '[w]e have witnesses; we have *property*; we have prints. We have everything. And we have all the stories.... And what you did and your involvement in it.' (Italics added.)

"The inadmissibility of defendant Mack's confession appears compelled by the ruling set forth in *People* v. *Johnson* (1969) 70 Cal.2d 541, 545 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366], that 'where a confession is induced by illegally seized evidence, the confession is subject to exclusion as fruit of the poisonous tree.' (See *Wong Sun* v. *United States* (1963) 371 U.S. 471, 485, 487-488 [9 L.Ed.2d 441, 453, 455-456, 83 S.Ct. 407].) In *Johnson,* the defendant's confession was obtained after *Miranda* warnings, followed by the defendant's being confronted with the confession of an accomplice which was inadmissible because it was the product of an illegal search of the accomplice's residence and an illegal arrest of the accomplice.

"So, in the case before us, defendant Mack's confession was obtained only after statements of a Los Angeles police officer to defendant Mack that the police had everybody that was in on the crimes, had all of the guns in custody, had witnesses and had *the property*. As we have previously pointed out herein, the property, which consisted of the items taken from the Bowden garage, was illegally seized, making the initial arrest of defendant and his codefendants illegal. Defendant Mack's confession, therefore, is inadmissible by application of the fruit-of-the-poisonous-tree doctrine since the confession was induced by illegally seized evidence.

"In view of our holding with respect to the errors involved in the trial court's rulings on the suppression-of-evidence motion and the admissibility of defendant's confession, we need not consider defendant's contention relative to the denial of the motion for a mistrial based on the prosecutor's exercise of peremptory challenges.

"The errors of denying defendant's motion to suppress evidence and admitting defendant's confession are necessarily prejudicial and reversible errors. '[A] confession obtained from a defendant in violation of constitutional guarantees is prejudicial per se and requires reversal regardless of other evidence of guilt.' (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 720 [68 Cal.Rptr. 817, 441 P.2d 625].) If a defendant is to be convicted, he is entitled to be convicted only on relevant, nonprejudicial evidence. (*People* v. *Guerrero* (1976) 16 Cal.3d 719, 730 [129 Cal. Rptr. 166, 548 P.2d 366].)"