[Crim. No. 21439. Oct. 22, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DEE MATTSON, Defendant and Appellant.

**COUNSEL**

Ronald S. Smith, under appointment by the Supreme Court, for Defendant and Appellant.

Quin Denvir, State Public Defender, and Eric S. Multhaup, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Gary R. Hahn, Norman H. Sokolow, Howard J. Schwab and Shunji Asari, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant was convicted of the wilful, deliberate and premeditated first degree murders of Cheryl G. and Adele C. (Pen. Code, §§ 187, 189.)[1] As special circumstances the jury found that the murder of Cheryl was committed during the commission or attempted commission of rape (§ 261, subd. (2)) and of lewd or lascivious conduct on a child under the age of 14 (§ 288); that the murder of Adele was committed during the commission or attempted commission of kidnaping (§ 207) and of rape (§ 261, subd. (2)); and, with respect to each victim, that defendant committed more than one first degree murder (former § 190.2, subd. (c)(5)). In separate counts the jury also found defendant guilty of kidnaping and raping each victim, in each case with the infliction of great bodily harm (§ 12022.7), and of lewd or lascivious conduct on Cheryl. Finally, defendant was convicted of kidnaping, raping, sodomizing, and orally copulating Kiz L. The jury found defendant to be legally sane and fixed the penalty at death. The court denied his motions for modification of the judgment and for a new trial. His appeal to this court is automatic. (§ 1239, subd. (b).)

We need recite only the facts relevant to the primary issue on appeal: On September 25, 1978, defendant was in custody in Ely, Nevada, on suspicion of the kidnaping, rape and armed robbery of a young woman in that state. Officer Dingle of the North Las Vegas Police Department advised defendant of his rights to remain silent and to counsel. Defendant replied that he did not wish to speak with Dingle and that he wanted an attorney. He was then placed under arrest and driven to North Las Vegas, some three or four hours away, and held in jail. On September 28 defendant was arraigned and again advised of his rights, but subsequently agreed to talk with Dingle about the Nevada rape and implicated himself in the crime.

On October 3 Officer Dingle again interrogated defendant. The questioning was initiated by Dingle and prompted by inquiries from officers of the

---

[1] All statutory references are to the Penal Code.

Police Department of Huntington Beach, California, concerning the rape of Kiz L. Dingle advised defendant of his rights and then questioned him about the California crime. Defendant implicated himself, giving a detailed description of his conduct with Kiz. Dingle testified that before he asked defendant about Kiz he made no attempt to ascertain whether defendant was represented by counsel. In fact, a Nevada public defender was appointed that same morning to represent defendant on the Nevada charges.

Over the next few weeks Officer Dingle repeatedly questioned defendant on "a number of areas," each time advising him of his rights; most of these conversations were initiated by Dingle and all seem to have taken place in the absence of counsel. Throughout this period Dingle kept in close contact with various California law enforcement agencies.

On November 7, 1978, Officer Reed of the Los Angeles Police Department went to North Las Vegas to question defendant about the death of Cheryl G. He first spoke with Officer Dingle, who informed him that when defendant was arrested in Ely he had invoked his privilege against self-incrimination and had asked for counsel. Reed then asked Dingle to contact the Nevada Public Defender—not, he testified, to secure counsel's consent to the questioning, but merely to inform him of the interrogation as a matter of "courtesy" or "protocol." Dingle telephoned the public defender's office but was unable to reach defendant's lawyer at that time; he made no attempt to speak with his supervisor, but instead left a message for the attorney. According to Dingle, defendant's attorney knew that his client was suspected of certain felony sex crimes in California, presumably the rape of Kiz L., but did not know he was also suspected of murder.

The next day Officer Dingle brought defendant to an interview room to be questioned by Officer Reed. Reed readvised defendant of his rights, and he agreed to talk. He admitted to the kidnaping, rape, and murder of Cheryl G. and further confessed to the kidnaping, rape, and murder of a young girl later identified as Adele C. As to each victim two conversations took place, one unrecorded and a second tape recorded.

In July 1979 the Los Angeles District Attorney's office filed an information charging defendant with the multiple counts of kidnaping, rape, other sexual offenses, and murder enumerated above.

I. *Admissibility of Defendant's Confessions Under Pettingill*

 Defendant contends that because he asserted his constitutional rights to remain silent and to be represented by counsel when he was initially advised of his *Miranda* rights by Officer Dingle in Nevada, his sub-

sequent confessions are inadmissible under *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108]. Although defendant's case is factually somewhat different from the situation confronting us in *Pettingill,* it is nonetheless governed by the principles of that decision, recently reaffirmed in *People* v. *Smith* (1983) 34 Cal.3d 251, 263-269 [193 Cal.Rptr. 692, 667 P.2d 149].

In *Pettingill* the defendant and three companions were arrested in Eureka at the scene of a burglary. When advised of his *Miranda* rights the defendant refused to talk to the police and was taken to the Eureka police station and booked. While arresting the codefendants the police saw and seized items they believed linked the suspects with Santa Barbara burglaries. The Eureka police contacted the Santa Barbara police and, three days after the defendant's arrest on the Eureka burglary, a Santa Barbara officer arrived and questioned him about burglaries in that jurisdiction. He first told the defendant that his companions had confessed, and recited other facts implicating the defendant in the crimes. He then advised the defendant of his rights and secured a confession to the burglaries. The Santa Barbara officer had been informed that the defendant had invoked his privilege against self-incrimination when first advised of his *Miranda* rights at the scene of the Eureka burglary.

We held the confessions inadmissible under the California privilege against self-incrimination (Cal. Const., art. I, § 15), rejecting the more permissive federal standard set out in *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321]. ■ We reaffirmed our holding in *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], that once a defendant has invoked his privilege against self-incrimination the police cannot question him again, even if they repeat the *Miranda* warnings: "By his refusal to waive his constitutional rights initially, defendant indicated that he intended to assert his rights—the privilege had been *once invoked*—and all further attempts at police interrogation should have ceased." (*Id.,* at p. 719.)

In *Pettingill* the People sought to distinguish *Miranda-Fioritto* on factual grounds, stressing that (1) the interrogation that produced the confession did not immediately follow defendant's assertion of his right to remain silent, but came three days later; and (2) the interrogation was conducted by an officer of a different law enforcement agency and dealt with crimes different from those for which the defendant had been arrested and first questioned. (21 Cal.3d at p. 242.) We rejected both distinctions. First, we observed that the three-day delay between the defendant's arrest on the Eureka burglary and his confession to the Santa Barbara crimes did not cure the failure of the police to cease all questioning, but in fact aggravated the error.

(*Id.*, at p. 244.) Further, we found the limitation on *Fioritto* contemplated by the second proffered distinction fundamentally objectionable. "It might catch the occasional sophisticated criminal who wishes to make selective statements about certain charges to specified agencies; but it would do so at the cost of sweeping into its net the larger majority of suspects who see the uniform only as a symbol of police authority, who neither know nor care about the precise jurisdictional competence of their interrogators, and who do not want to talk to any of them. Little would remain of the *Fioritto* rule if it could be evaded simply by sending in an officer from a different police or sheriff's department every time a suspect asserts his right to remain silent, or by changing the subject of the questioning from one of the crimes under investigation to another." (*Id.*, at p. 245.)

 Here defendant's October 3 confession to the crimes against Kiz L. should have been excluded under the *Fioritto-Pettingill* rule. Responding to an inquiry from the Huntington Beach police (see fn. 2, *post*), Officer Dingle initiated an interrogation of defendant one week after his arrest and elicited his confession to the California crime. As we stated in *Pettingill*, neither the delay between the initial assertion of the privilege nor the fact that the renewed questioning concerned a different crime cures the *Fioritto* error of resuming interrogations once a suspect has asserted his *Miranda* rights.

 Officer Reed's interrogations of defendant on November 8 were also conducted in violation of the *Fioritto-Pettingill* doctrine. Reed initiated all four conversations. As he testified at the hearing on defendant's motion to suppress, Reed knew that when defendant was first questioned in late September he had refused to talk and had asked for an attorney. He also knew that a public defender had since been appointed to represent defendant. Yet he made only the token gesture of leaving a telephone message for the public defender before proceeding to question defendant about crimes of which his counsel was evidently unaware. Again, under *Pettingill* neither the delay between defendant's initial invocation of the privilege against self-incrimination and the renewed interrogation—in this case six weeks, throughout which time defendant remained in police custody (cf. *People* v. *Mack* (1980) 27 Cal.3d 145, 152-154 [165 Cal.Rptr. 113, 611 P.2d 454])—nor the fact that Reed questioned defendant about different crimes occurring in another jurisdiction, dictates a contrary result.

 It is settled that the introduction of a confession obtained in violation of constitutional guarantees is prejudicial per se and that a conviction based on such a confession must be reversed. (*Fioritto, supra,* 68 Cal.2d at p. 720.) The People seek to avoid this conclusion, however, by

arguing that *Pettingill* does not govern the interrogations here because they occurred in Nevada.

## II. *Choice of Law*

We begin with the proposition that, as explained above, both the October 3 and the November 8 confessions would be inadmissible had they occurred in California. We may also assume, for purposes of analysis only, that both these confessions would be admissible under Nevada law.

As amicus curiae for defendant observes, the deterrent purpose that underlies the *Pettingill* exclusionary rule is no less implicated here simply because the interrogations occurred in Nevada. (Tullis & Ludlow, *Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule* (1975) 10 U.S.F. L.Rev. 67, 80-81.) The November 8 interrogation was conducted by a California officer, and the October 3 interrogation, although conducted by a Nevada officer, was clearly the result of close collaboration with California police.[2]

■ It is well established that exclusionary rules may apply to a search or interrogation by agents of foreign countries if United States officials participate sufficiently in the search or interrogation. (See, e.g., *United States* v. *Emery* (9th Cir. 1978) 591 F.2d 1266, 1267-1268 [statements from interrogation by Mexican police conducted in presence of American law enforcement agents must be excluded]; *Stonehill* v. *United States* (9th Cir. 1968) 405 F.2d 738, 746 [Fourth Amendment not applicable to a search by foreign officials unless United States agents substantially participate so as to create a joint venture]; *United States* v. *Orman* (D.Colo. 1976) 417 F.Supp. 1126, 1131 [evidence unlawfully obtained in Turkey by U.S. agents acting with foreign agents would be excluded at trial]; see also *United States* v. *Morrow* (5th Cir. 1976) 537 F.2d 120, 139, and cases cited; *People* v. *Helfend* (1969) 1 Cal.App.3d 873, 885-890 [82 Cal.Rptr. 295] [statements given by defendant in Mexico without *Miranda* warnings admissible in California when state officials did not aid, encourage, or participate in the interrogation].) ■ ■ By analogy to these cases, we conclude that the *Pettingill* exclusionary rule applies here. Both confessions were the di-

---

[2]The record reveals that before the October 3 interrogation Officer Dingle spoke with Detective Branch of Huntington Beach at least twice—once in late September, and again on October 3. During the latter conversation Branch gave Dingle information that he subsequently used to question defendant: among other things, he told Dingle that he was investigating defendant for a kidnap/rape incident in Southern California. Dingle then questioned defendant about the California incident, and tape recorded his confession to the kidnap/rape of Kiz L. Dingle then reported back to Branch. The next day, Branch prepared a declaration for a felony criminal complaint against defendant, and a felony arrest warrant was issued in California on October 6.

rect result of interrogations in violation of *Pettingill,* and both were conducted by a California officer or his agent. To sanction such interrogations would encourage California police to engage in activities outside our borders that violate our own constitutional standards. (Tullis & Ludlow, *supra,* 10 U.S.F. L.Rev. at p. 82.) Accordingly, we hold it was prejudicial error to admit the ensuing confessions, and the judgment of conviction must be reversed.

### III. *Proof of Corpus Delicti for Felony-based Special Circumstances*

■ For the guidance of the court on retrial, we briefly address defendant's further contention that the corpus delicti of the felony-based special circumstances must be proved independently of his extrajudicial statements.

Defendant acknowledges that under *People* v. *Cantrell* (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256], the People are not required to establish the corpus delicti of an underlying felony used to convict an accused of murder on a felony-murder theory. However, he urges that we distinguish such an underlying felony from a charge of felony-based special circumstance. If the latter were found true, of course, it would subject the defendant to a penalty phase and possibly to the punishment of death.

Former Penal Code section 190.4, subdivision (a), provided in part that "[w]herever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved *pursuant to the general law* applying to the trial and conviction of the crime." (Italics added.)[3] Defendant contends this language was intended by the Legislature to make the *Cantrell* rule inapplicable when the underlying felony is charged as a special circumstance. He reasons that "general law" incorporates the corpus delicti rule generally applicable to proof of felony offenses. (*People* v. *Towler* (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253]; *In re Robert P.* (1981) 121 Cal.App.3d 36, 38-39 [175 Cal.Rptr. 252].) He concludes that because there is no evidence independent of his confessions to establish the corpus delicti of the lewd and lascivious conduct, kidnaping, and rape offenses, the special circumstance allegations they support should have been disallowed.

Construing the relevant but somewhat ambiguous language of section 190.4 in the light most favorable to the defendant, as we must (*In re Tartar* (1959) 52 Cal.2d 250, 256-257 [339 P.2d 553]), we agree that the "general law" proviso incorporates the corpus delicti requirement for felonies sup-

---

[3] Present section 190.4, subdivision (a), is virtually identical.

porting special circumstance allegations. Indeed, this interpretation is consistent with the requirement of section 190.4 that the felonies enumerated in section 190.2 also be "charged" in separate counts, as they were here. Moreover, a contrary interpretation would produce an anomalous result: under the People's view, a felony-based special circumstance would be treated as an "underlying felony" within the meaning of *Cantrell* and hence could support a felony-murder conviction without independent evidence; yet when the same felony is then charged as a separate substantive crime as required by section 190.4, the corpus delicti rule would apply to *prohibit* exclusive reliance on the defendant's extrajudicial statements. We conclude that the corpus delicti of felony-based special circumstances must be established independently of an accused's extrajudicial statements.[4]

The judgment is reversed.

Bird, C. J., Broussard, J., and Reynoso, J., concurred.

**KAUS, J.**—I respectfully dissent. In my view, neither *People v. Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108] nor *People v. Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625] calls for exclusion of the confessions made by defendant in Nevada on October 3, 1978, and November 8, 1978. I briefly discuss each of the confessions separately.

I

Given the majority's assumption that the Nevada police officer who conducted the October 3 interrogation violated no provision of Nevada law (p. 92, *ante*), I see no reasonable basis for excluding the resulting confession. Although—as the majority states—the Nevada officer's interrogation did result from inquiries by California authorities, there is nothing in the

---

[4]In the recent case of *People v. Sanders* (1983) 145 Cal.App.3d 218 [193 Cal.Rptr. 331], the defendant appealed from a judgment convicting him of first degree murder with the special circumstance of robbery. He argued, inter alia, that the corpus delicti of the robbery special circumstance should have been established by evidence independent of his extrajudicial statements. (*Id.,* at p. 222.) The court acknowledged "[t]he fundamental rule . . . that a person may not be convicted of a crime solely on the basis of his confession or admission of guilt," and found that the corpus delicti of the murder was established by independent evidence. (*Id.,* at p. 223.) The court then stated without further analysis that "the defendant's statements that he committed the crime in the course of a robbery were admissible to establish the degree of the crime *as well as the existence of the special circumstances . . . .*" (*Ibid.,* italics in original.) However, because the court found that "[i]n any event there was more than adequate evidence aside from defendant's statements to establish beyond any doubt that a robbery was committed against the victim" (*ibid.*), the corpus delicti language is clearly dictum. To the extent that it is inconsistent with the view we express today, *Sanders* is disapproved.

present record to suggest that at the time they made those inquiries the California officials were informed that defendant had invoked his *Miranda* rights when first arrested on September 25 or that the California officials requested the Nevada officer to conduct the interrogation despite such invocation. If the California officers had no reason to know of the defendant's earlier request for counsel, and if the Nevada officer was acting in conformity with Nevada law in conducting the questioning, I do not see how the majority can conclude that the admission of this confession "would encourage California police to engage in activities outside our borders that violate our own constitutional standards." (P. 93, *ante.*) Rather, this appears to be a classic example of a case in which the exclusion of the confession will serve no deterrent value in this state and in which the law of the foreign jurisdiction where the interrogation occurred should apply. (See, e.g., *People* v. *Blair* (1979) 25 Cal.3d 640, 656 [159 Cal.Rptr. 818, 602 P.2d 738]; *People* v. *Helfend* (1969) 1 Cal.App.3d 873, 885-890 [82 Cal.Rptr. 295].)

## II

The foregoing reasoning does not, of course, apply to the November 8 interrogation, because the California officer who conducted that questioning was aware that defendant had invoked his *Miranda* rights at the time of his arrest by requesting an attorney. Nonetheless, the November 8 interrogation still did not violate *Pettingill/Fioritto* principles.

In *People* v. *Mack* (1980) 27 Cal.3d 145, 153-154 [165 Cal.Rptr. 113, 611 P.2d 454], we established that the *Pettingill/Fioritto* doctrine does *not* mean that a defendant who once invokes his *Miranda* rights may never thereafter be found to have voluntarily waived those rights in a subsequent questioning session. In *Mack,* the defendant—arrested for receiving stolen property—was released from custody after invoking his right to remain silent at an initial questioning session. Five or six days later he was rearrested on new charges and readvised of his *Miranda* rights. He then confessed to the new charges.

On appeal, Mack contended that since he had invoked his *Miranda* rights in the first questioning session, his later confession was inadmissible under *Pettingill* and *Fioritto.* We rejected the contention, explaining that in the period between the two questioning sessions, while defendant was at liberty, "[h]e was entirely free to consult 'family, friends, or counsel' concerning the charges he knew, or should have known, would be brought against him. . . . He knew his rights. He had asserted them when first arrested. In the interim he had an opportunity to carefully consider his predicament and to seek any support he needed—personal or professional—to continue asserting

his rights, if he so chose. Under the circumstances, his decision to waive his rights must be considered voluntary." (27 Cal.3d at p. 154.)

Although in this case, unlike in *Mack,* defendant had not been released from custody before the November 8 interrogation, an intervening event at least as significant as release did occur: defendant was provided the attorney that he had requested when he first invoked his *Miranda* rights. After consulting with that counsel, defendant spoke freely with the police on numerous occasions, confessing to a number of crimes. The Nevada officer testified that he saw defendant's counsel almost daily and that counsel had advised him that he had no objection to the questioning of defendant. Under these circumstances, it serves no discernible purpose to hold that defendant's initial September 25 request to see an attorney—a request that had been fully satisfied more than a month before the November 8 questioning— had a lingering effect which invalidated his later waiver of rights. (See also *People* v. *Booker* (1977) 69 Cal.App.3d 654, 660, 664 [138 Cal.Rptr. 347].)[1]

Accordingly, *Pettingill* and *Fioritto* provide no basis for overturning the trial court's admission of the November 8 confession.

### III

Since the majority holds that defendant's convictions must be reversed because of the admission of his confessions, my views on the other guilt, special circumstance and penalty phase issues raised by defendant cannot affect the judgment. Accordingly, I express no opinion on those issues.

Grodin, J., concurred.

---

[1]*Booker* also demonstrates that the November 8 questioning did not violate defendant's rights under *Massiah* v. *United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 250, 84 S.Ct. 1199]. (69 Cal.App.3d at pp. 663-665. See also *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 187-188 [133 Cal.Rptr. 511, 555 P.2d 297].)