[No. A031212. First Dist., Div. Two. Nov. 3, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
VERNON INMAN, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to rules 976 and 976.1 of the California Rules of Court, this opinion is certified for publication except for parts I, II and III.

## COUNSEL

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ann K. Jensen and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SMITH, J.**—Following trial by jury, Vernon Inman appeals his conviction and sentence for 27 felony counts of receiving stolen property (Pen. Code, § 496)[1] and a single count of carrying a concealed weapon in a vehicle (§ 12025, subd. (a)).

### BACKGROUND

The offenses arise out of two encounters in late 1983 in which police found Inman carrying property that turned out to have been taken in a series of Sonoma County burglaries spanning July through early December of that year.

The first encounter was at a gun shop on November 22. Inman had proposed to trade a Colt .45 semiautomatic pistol to an acquaintance, Louis Zall, that day. The two went to the shop because Zall wanted to have the shop's owner, a gunsmith whom he had dealt with before, inspect the Colt and run its serial numbers to make sure it was not stolen. After the gunsmith disassembled and inspected the gun, Zall asked him to check the numbers. The gunsmith handed the gun's frame to county sheriff's detective Charles Smith,

---

[1] All undesignated statutory section references in this opinion will be to the Penal Code.

a personal friend who had just entered the shop, and asked Smith if he would run the numbers for him. Smith did, using an office phone to call the sheriff's office, and learned that the gun had been reported stolen about four months earlier in Clearlake. When Smith relayed the information to Inman, Inman first explained that someone named Roy had reported the gun stolen as part of an insurance scam; then he explained that he had traded someone named Larry some stereo equipment for the gun at a flea market. Smith issued Inman a receipt and explained that he would have to hold the gun pending further investigation. Inman furnished identification and an address and telephone number, and then left the shop.

After Inman left, the gunsmith mentioned a second gun he had seen Inman carrying. Smith left the shop and asked Inman about it. Inman, who was seated in a Chevrolet van, produced the gun. Smith wrote down its serial number, explained that he would run that number as well, and asked him to please hold the gun until contacted again. Inman left. Smith later learned that the gun had been taken in another Sonoma County burglary.

The detective subsequently tried without success to reach Inman at the phone number he had given but left messages. Then, on the afternoon of December 7, Smith spotted Inman driving his van and followed him to a private residence. Inman explained that he had been too busy to return the calls. He agreed to drive to the sheriff's office to talk. At the sheriff's office, Inman consented to an interview after waiving his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1692]) rights. He and Smith spoke concerning the Colt .45. Inman elaborated on the gun's claimed connections to the Roy and Larry he had previously mentioned.

Meanwhile a second detective, Jim Piccinnini, was carrying out instructions from Smith to peer in through the van's windows and look for possible contraband. Piccinnini broke in on the interview with the report that he could see a fur coat and stereo components, among other items, in the van. Inman explained to Smith that the coat had been left there by a woman whose name or address he could not recall and that the stereo equipment was part of a component set he had been "putting together for quite sometime [*sic*]." Smith then informed him that the Colt .45 had been taken in a burglary in which a fur coat and other weapons had been taken, and he asked if he could look at the fur coat more closely. Inman said he was reluctant to allow that "because he was a horse trader and he was very careful about who he bought and sold from, but there was a possibility at times that he would be purchasing stolen property; . . ." After brief further questioning, Smith placed Inman under arrest and, during prebooking procedures, announced that he would get a search warrant for the van. Inman at that point volunteered that he had "felt suspicious" about obtaining some

military weapons at a flea market a day and a half earlier because the man who had them "was acting very secretively. . . ." Nevertheless, he said, he "stupidly" went through with the deal. Inman also mentioned that there was a considerable amount of jewelry in the van—a personal collection that he had had "for years and years."

Detective Piccinnini then obtained Inman's consent to go out to the van and look inside. In the van were discovered the numerous stolen items on which all but one of the receiving stolen property counts were ultimately based. Inman had before then expressed concern to Piccinnini, as he had to Smith, that certain weapons in the van might be stolen. A later search of the van revealed a .38 caliber semiautomatic pistol in a trash bag. That gun became the subject of the misdemeanor weapons possession count.

Inman was subsequently released on bail. During his release, he tried several times without success to telephone Smith. Finally, on the morning of December 12, the detective returned one of Inman's calls, and Inman indicated that he wanted to meet with him. They arranged for a 2:30 p.m. meeting that day and met as planned. The meeting took place in an interview room and was secretly tape recorded by Smith. A transcription of their conversation was read into evidence at trial.

APPEAL

I-III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

IV

Relying on *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], Inman argues that the court erroneously admitted his taped December 12 conversation with Detective Smith. The court ruled to admit the conversation over defense objections on *Miranda/Pettingill* grounds after holding an in camera evidentiary hearing on the issue in midtrial.

The dispute arises from the fact that sometime on December 7, after his initial *Miranda* waiver, statements, arrest and consent to search, Inman invoked his rights by asking for an attorney. Then, five days later (on the 12th), while free on bail pending arraignment, he was interviewed by Detective Smith without specific readvisement of his right to have an attorney

---

*See footnote, *ante,* page 1137.

present.[5] The Attorney General apparently concedes that the December 12th advisements were inadequate in themselves but argues that advisements were not constitutionally required and that Inman's statements on that date were voluntarily made. We agree.

■ Inman was free on bail, initiated the interview himself (to try and regain possession of some personal effects), came to the station on his own, was reminded of his prior advisement and assertion of rights, was told that those rights were still "in force," was again forewarned that he might incriminate himself and did not have to say anything, was not coerced or threatened during the interview, was not arrested or otherwise deprived of his freedom, and walked away afterward. The undisputed facts show that he was not "in custody" for *Miranda* purposes (*Green* v. *Superior Court* (1985) 40 Cal.3d 126, 133-135 [219 Cal.Rptr. 186, 707 P.2d 248], cert. den. (1986) 475 U.S. 1087 [89 L.Ed.2d 727, 106 S.Ct. 1472]) and that his statements were voluntary under the totality of circumstances (*People* v. *Thompson* (1980) 27 Cal.3d 303, 327-328 [165 Cal.Rptr. 289, 611 P.2d 883]). While the record does show an apparent *Miranda* violation five days earlier, when Inman was evidently interrogated for a time after invoking his rights, he does not attempt to argue that the later interview was thereby tainted.[6] (Cf. *People* v. *Mack* (1980) 27 Cal.3d 145, 152 [165 Cal.Rptr. 113, 611 P.2d 454].)

■ Inman's reliance on *Pettingill* does not help him. The rigid rule of *Pettingill*, one founded on independent state constitutional grounds (Cal. Const., art. I, § 15) and at odds with federal law (see *Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 385-387, 101 S.Ct. 1880], and cases cited), is this: Once the privilege against self-incrimination is invoked, whether by refusing to talk or by requesting counsel, *all* further attempts at interrogation must cease, despite intervening readvisements and waivers, and the passage of time. (*Pettingill, supra,* 21 Cal.3d 231, 237-246, *People* v. *Mattson* (1984) 37 Cal.3d 85, 90-91 [207 Cal.Rptr. 278, 688 P.2d 887]; *People* v. *Smith* (1983) 34 Cal.3d 251, 263, 269 [193 Cal.Rptr. 692, 667 P.2d 149].) However, the rule does not apply where the subsequent interrogation, as here, is preceded by a significant period of time out of custody. (*People* v. *Mack, supra,* 27 Cal.3d 145, 154; cf. *People*

---

[5]Near the start of interview, Smith alluded to Inman's prior invocation of "rights," specifically reminded him of his right to remain silent and that his statements could be used against him, and stated that "those rights still are in force." Inman agreed to talk. No specific mention of his right to counsel preceded the waiver.

[6]Nor is there any evidentiary issue concerning the December 7 postinvocation statements themselves. They were never admitted at trial. Further, Inman does not challenge the trial court's rulings that his various *pre*-invocation statements to detectives on both November 22 and December 7 were admissible.

v. *Mattson, supra,* 37 Cal.3d at p. 91; *People* v. *Borba* (1980) 110 Cal.App.3d 989, 996 [168 Cal.Rptr. 305].)

It is the inherently coercive atmosphere of *custodial* interrogation that makes *Miranda* advisements necessary to safeguard the exercise of free will. (*Pettingill, supra,* 21 Cal.3d at pp. 237-238.) ■ *In that setting,* once a waiver of rights is refused, subsequent readvisements and requests for waivers themselves become attempts at continued custodial interrogation—the very thing that must *cease* after an invocation of rights (*id.,* at pp. 238-241), and thus even assertedly "voluntary" or "spontaneous" statements obtained through such attempts remain inadmissible (p. 239). However, once custody ceases, and with it the *inherently* coercive aspect of subsequent interrogation, so does the need to specially safeguard the exercise of free will. ■ The voluntariness of statements given during interrogation subsequent to release from custody—whether given out of custody or again in custody—must be tested under standards ordinarily applied to the new setting, with the prior assertion of rights being no more than a factual circumstance to consider. In this case, Inman's subsequent interrogation was noncustodial, *Miranda* advisements were therefore unnecessary, and as already noted, his statements were voluntary under the standards for such interrogation.

*Pettingill* discounts the significance of a lapse of time between the assertion of rights and new interrogation but, again, on the assumption that the suspect remains in custody. Addressing the three days that elapsed between the defendant's assertion of privilege in *Pettingill* and his subsequent waiver and confession, the Supreme Court noted: "Throughout that period he was *continually in police custody,* and had not been taken before a magistrate for arraignment and appointment of counsel. . . . [S]uch a delay is not psychologically beneficial or even neutral: the longer an individual is *held incommunicado,* the greater his incentive to confess so as to end his *isolation from family, friends, or counsel.* And if *during that period* . . . the police . . . repeat the *Miranda* warnings and ask if the defendant wants to talk to them, the compulsion to make a statement in order to 'get them off my back' may be well nigh irresistible." (*Pettingill, supra,* 21 Cal.3d at p. 242, italics added and fn. omitted.)

That reasoning does not apply to a lapse of time while free of custody. The Supreme Court emphasized this distinction in upholding the admissibility of a postrelease renewed interrogation in *People* v. *Mack, supra,* 27 Cal.3d 145, noting: "By contrast [with *Pettingill*], defendant was released on the original charges after he declined to make a statement; he was at liberty for five or six days before he was rearrested on the present charges, readvised of his *Miranda* rights and confessed. During that considerable

period the police exerted no pressure whatsoever on defendant to confess. He was entirely free to consult 'family, friends, or counsel' concerning the charges . . . . He knew his rights. He had asserted them when first arrested. In the interim he had an opportunity to carefully consider his predicament and to seek any support needed—personal or professional—to continue asserting his rights, if he so chose. Under the circumstances, his decision to waive his rights must be considered voluntary." (*Id.*, at p. 154.)

The circumstances here are parallel. Of course, the defendant in *Mack* was readvised of and waived his rights before the renewed interrogation, but we do not read *Mack* as requiring that in every case. The defendant there was formally rearrested and hence "in custody" for *Miranda* purposes when reinterviewed, thus making advisement and waiver essential in any event. Here, where the defendant was undisputably *not* "in custody" at the point of the later interview, *Miranda* warnings (though partially given here) were not prerequisite. Rather, their existence or absence is just one factor bearing on voluntariness.

No violation of *Miranda* or *Pettingill* occurred. The December 12 tape-recorded statement was properly admitted.

### DISPOSITION

The judgment is affirmed.

Kline, P. J., and Rouse, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 22, 1987.