531 A.2d 1290

**Jerome Edward BUIE**

v.

**STATE of Maryland.**

**No. 100 Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Oct. 9, 1987.

Certiorari Denied Jan. 7, 1988.

John L. Kopolow, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief) Baltimore, for appellant.

Norman L. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Alexander Williams, Jr., State's Atty. and Joseph B. Chazen, Asst. State's Atty., for Prince George's County, on the brief, Upper Marlboro, for appellee.

Argued before WILNER, ALPERT and BLOOM, JJ.

BLOOM, Judge.

A jury in the Circuit Court for Prince George's County, presided over by Judge Jacob S. Levin, convicted appellant,

Jerome Edward Buie, of robbery with a deadly weapon and the use of a handgun in the commission of a felony. Judge Levin sentenced appellant to consecutive sentences of twenty years for the robbery with a deadly weapon and fifteen years for the use of a handgun.

In this appeal from those judgments, appellant asserts that the trial court erred when it denied his motion to suppress evidence seized at the time of his arrest. He also contends that the trial court erred when it called his cousin, Antonio Buie, as its witness. We disagree with appellant's assertions of error and will affirm the judgments.

## I  *Motion to Suppress*

Evidence produced at the pre-trial hearing on appellant's motion to suppress disclosed that on 5 February 1980 seven police officers arrived at appellant's home with a valid warrant for his arrest. The police also had a warrant for the arrest of Lloyd Allan. Based on eyewitness identifications, both suspects were charged with the robbery of a pizza shop, which had taken place two days earlier.

While two of the officers remained outside to secure the exits, the other five entered appellant's home. Corporal Rozar, one of those five, stood at the entrance to a flight of stairs leading down to a basement. Corporal Rozar called down the stairs several times, identifying himself and commanding everyone in the basement to come out with hands raised. Eventually appellant emerged from the basement and was promptly arrested, handcuffed, and searched. After appellant's arrest, Detective Frolich went into the basement where he saw, in plain view, a red jogging suit. He seized the jogging suit because it matched a description of the clothing worn by the armed robber at the scene of the crime for which appellant was arrested.

Cross-examining Detective Frolich at the suppression hearing, defense counsel elicited the following with respect to the officer's entry into the basement:

Q.  You observed the officer search [appellant]?
A.  Yes, sir.

Q. And did he find anything on him?

A. I don't recall.

Q. And you observed the officer handcuff [appellant]?

A. Yes, sir.

Q. And then place him under arrest?

A. Yes, sir.

Q. What did the officer do with [appellant] at that point?

A. I don't know.

Q. Took him out, whatever. At this point, you decided to go into the basement?

A. Yes, sir.

Q. Did you know what you were looking for?

A. I just went down there in case there was someone around.

.    .    .    .    .

Q. Did you have any reason to believe that anyone else was in the house besides Mr. Buie?

A. I had no idea who lived there

.    .    .    .    .

Q. But, was there any particular knowledge that allowed you to know that [appellant] was at home at that time?

A. Yes, sir.

Q. What was that?

A. I had a secretary in my office call his residence and ask to speak to him.

Q. And who answered the phone?

A. I don't know who answered the phone. But, I think it was female and then she had a conversation with Mr. Buie.

Q. So you knew there was a girl and a man in the house?

A. Yes, sir.

At the close of the suppression hearing, Judge Levin overruled appellant's motion to suppress, stating that Detective Frolich's search of the basement was reasonable to insure

the officers' safety because appellant was charged with a serious offense involving a handgun and because the police did not know who else was in the basement following appellant's arrest.

During the course of trial, before offering the jogging suit in evidence, the State's Attorney asked the trial judge to reopen the suppression hearing in order to clarify the facts and circumstances surrounding the basement search. The trial judge reopened the suppression hearing over appellant's objection. The jury left the courtroom and Detective Frolich once again took the stand. Detective Frolich reiterated that warrants were sworn out for both appellant and his suspected accomplice and stated, for the first time, that the officers who arrived at appellant's home on 5 February 1986 were armed with both warrants. Further questioning of Detective Frolich produced the following:

Q. Now, at the time you arrested [appellant], had an arrest of [appellant's accomplice] been made?

A. No, sir.

. . . . .

Q. And did you have any knowledge or information concerning how [appellant] and [the accomplice] were related as far as—in any fashion?

. . . . .

A. They had been arrested prior, in November, for an armed robbery.

. . . . .

Q. Did you know whether they knew each other any way?

A. I had information, or the information from the other robbery, that they were running together.

Q. Okay. And at the time you went down to the basement, why did you go there?

A. To see if [appellant's accomplice] may be in the basement.

A. Okay. At that point, you didn't know whether [appellant's accomplice] would be there or not?

A.   No, sir.

Judge Levin found no cause to change his previous ruling based on the second hearing, and again overruled the motion to suppress.   Appellant challenges Judge Levin's reopening of the hearing as well as the denial of the motion to suppress.

We note, initially, that the State bears the burden of proving circumstances which justify a warrantless search. *Stackhouse v. State*, 298 Md. 203, 220, 468 A.2d 333 (1983) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971); *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, 64 (1951); *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153, 158 (1948).   Furthermore, "in determining the lawfulness of the search we may concern ourselves only with what the police officers believed at the time." *Stackhouse, supra,* 298 Md. at 220, 468 A.2d 333 (citing *Ker v. California*, 374 U.S. 23 at 40 n. 12, 83 S.Ct. 1623 at 1633 n. 12, 10 L.Ed.2d 726 at 742 n. 12 (1963); *Johnson v. United States*, 333 U.S. 10, 17, 68 S.Ct. 367, 370, 92 L.Ed. 436, 442 (1948) [footnote omitted] ).

■   The decision at a pre-trial suppression hearing is binding at the trial unless the trial judge, in his discretion, grants a hearing *de novo* on the motion, *Hall v. State*, 15 Md.App. 363, 370, 290 A.2d 803 (1972);  Md.Rule 4–252(g)(2), in which event our review is limited to the *de novo* ruling. *Bartram v. State*, 33 Md.App. 115, 140, 364 A.2d 1119 (1976).

■   We agree with appellant's contention that the trial judge had no authority to reopen the suppression hearing at the State's request.   Maryland Rule 4–252(g)(2) states that "[i]f the court denies a motion to suppress evidence, the ruling is binding at the trial unless the court, in its discretion, grants a *de novo* hearing on a renewal of the motion." Here, there was no renewal of the motion, and the trial judge did not grant a *de novo* hearing.   He merely reopened the suppression hearing to allow the State to rein-

force the testimony of one witness. That is not within the contemplation of the Rule.

With regard to violations of the Maryland Rules of criminal procedure, the Court of Appeals stated in *Noble v. State*, 293 Md. 549, 557–58, 446 A.2d 844 (1982):

> This Court has firmly adhered to the principle that the rules of [criminal] procedure are precise rubrics to be strictly followed, and we shall continue to do so. A violation of one of these rules constitutes error, normally requiring such curative action or sanction as may be appropriate.
>
> .  .  .  .  .
>
> It does not follow, however, that the harmless error doctrine has no application to the Maryland Rules and that a violation of a procedural rule can never be harmless....
>
> .  .  .  .  .
>
> If the standard for harmless error is met, a violation of a procedural rule will not ordinarily result in a reversal of a conviction.

The test for harmless error in criminal cases was set forth in *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976), as follows:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated.

█ The error in reopening the suppression hearing had no influence on the trial proceedings and certainly not on the jury's verdict. The trial judge did not alter the earlier ruling on admissibility of the seized evidence as a result of the later testimony. The motion to suppress was denied on the basis of the *pre-trial* hearing. We believe that the court's initial ruling was correct; therefore the later testi-

mony had no significance and any error in receiving it was harmless beyond a reasonable doubt.

In *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the United States Supreme Court held that, incident to a lawful arrest, police officers may search the arrestee's person and areas " 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. The Court held that all other searches conducted contemporaneous to an arrest must be made pursuant to a warrant or must fall within one of the "well-recognized exceptions" to the warrant requirements. *Id.* at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694.

Following *Chimel,* the Court of Appeals of Maryland, in *Stackhouse, supra,* held that incident to a lawful arrest any contemporaneous search beyond the arrestee's "wingspan" must be made pursuant to a warrant or to an exception to the warrant requirement.

There is some similarity between the facts of *Stackhouse* and the facts of this case. In each case police officers entered appellant's home to execute an arrest warrant and, after making the arrest, "searched" the arrestee's hiding place.

The similarities between these two cases end when the reasons for the post arrest searches are compared. In *Stackhouse,* policemen searched the arrestee's hiding place for evidence that might be destroyed but were unaware of any facts to indicate that the destruction of evidence was imminent or even likely. In this case, a police officer who had knowledge that a warrant had been sworn out for the arrest of an accomplice went into the basement of appellant's house where appellant had been hiding, to see if there was anyone else hiding there.

In its analysis of the legality of the search in *Stackhouse,* the Court noted that "[i]n holding that the police may search the area within the arrestee's reach incident to a

lawful arrest, the Supreme Court in *Chimel* acknowledged in dicta that exigent circumstances provided a second recognized justification for a warrantless search or seizure incident to arrest. 395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694." *Id.* 468 A.2d at 338. The *Stackhouse* Court, however, defined "exigency" narrowly: "The meaning of exigent circumstances is that the police are confronted with an emergency—circumstances so imminent that they present an urgent and compelling need for police action." *Id.* 468 A.2d at 342. The Court stated: "upholding warrantless searches based upon exigent circumstances involves two principal categories of cases: 'hot pursuit,' and destruction or removal of evidence." *Id.* 468 A.2d at 338.

The Court concluded in *Stackhouse* that the post-arrest search of Stackhouse's hiding place violated the Fourth Amendment guarantee against unreasonable searches and seizures because the State failed to demonstrate exigent circumstances justifying the search. The Court stated: "Where a warrantless search is based upon the destruction or removal of evidence surrounding circumstances must present a specific threat to known evidence." *Id.* 468 A.2d at 339. The facts in *Stackhouse* failed to present such a threat.

In the case *sub judice*, the State does not argue that Detective Frolich's post-arrest search of appellant's basement took place under exigent circumstances. Detective Frolich was not in a "hot pursuit" situation; he had no reason to fear the imminent destruction of evidence. Nevertheless, the absence of those two circumstances does not mean that the invasion of the basement was unreasonable.

■ Although Detective Frolich did not expressly so state, it is certainly inferable from his testimony at the pre-trial suppression hearing that he went into appellant's basement to look for the suspected accomplice or anyone else who might pose a threat to the officers on the scene. He knew two arrest warrants had been issued in connection

with the armed robbery of the pizza shop; he stated on cross-examination that he went downstairs not to search for evidence but to see if someone else was there. Who would he be looking for other than the known accomplice or someone else who might pose a danger to him and his fellow officers?

Although Maryland has not previously determined whether, following the execution of an arrest warrant, officers may make a cursory inspection of the premises where the arrest took place to search for other known suspects, other states have ruled in the affirmative on this issue.

In *Guevara v. Superior Court*, 7 Cal.App.3d 531, 86 Cal.Rptr. 657 (1970), police officers arrested the accused at his apartment on drug charges after being informed that a drug transaction was taking place there. Following their arrest of the accused, police walked through the apartment to search for other parties to the transaction. The California appellate court held that the walk-through search was reasonable. The court wrote, "It is clear that the officers had information which it was their right, and their duty, to follow up. Having arrested defendant, it was not unreasonable for them to walk through the house to see if others were there...." *Id.* at 535, 86 Cal.Rptr. at 659. The court stated that such a sweep through the house was not unreasonably excessive, but constituted "basic police investigation of information received." *Id.* at 535, 86 Cal.Rptr. at 659.

In *Jones v. State*, 565 S.W.2d 934 (Tex.Crim.1978), police officers suspected five men of robbing a department store. After arresting three of the suspects, they arrested the fourth one in his home, and afterwards walked through the home to search for the fifth suspect. The Court of Criminal Appeals of Texas upheld the search because:

The officers knew that appellant was only the fourth of five robbers who had been arrested and they were fully justified for their own protection to go into the hall and look into the open doorways of the bedrooms to see if the

fifth robber, or someone else, was there who might cause them harm.

*Id.* at 937.

In *People v. Mack,* 27 Cal.3d 145, 165 Cal.Rptr. 113, 611 P.2d 454 (1980), police officers were informed that property stolen by five named suspects could be found in the garage at the home of one of the suspects. When officers approached that suspect's home with the intention of questioning him, they were spotted by two men leaving the garage. The two men reentered the garage and the officers heard shouting and the sound of furniture moving. The officers ordered the occupants out of the garage. Five men emerged, and an officer entered the garage to search for additional suspects. The Court held that the officer "acted properly in entering the garage to search for additional suspects. He did so out of justification for his own safety ... he did not know whether the five men who had come out of the garage included all five of the accused burglars." *Id.* at 151, 165 Cal.Rptr. at 116, 611 P.2d at 457.

The rationale for post-arrest sweep searches for suspects hinges on the police officer's reasonable belief that other suspects are at large; however, the arresting officer need not have probable cause to believe that the other suspects are present. Professor La Fave, in analyzing *Guevara,* stated:

It is important to note that the *Guavara* [*Guevara*] Court did *not* say that the police had reasonable grounds to believe that another offender was on the premises and that the entry into the kitchen was nothing more than a pre-arrest search for this person. Rather, the court's holding appears to be based on the proposition that once the police have lawfully entered the premises and made an arrest therein, something less than the usual quantum of probable cause is needed to justify a limited additional intrusion to investigate the possibility that other offenders are present.

2 W.R. La Fave, *Search and Seizure,* § 6.4(b) at 642 (2d ed. 1987). (Emphasis in original.) (Footnotes omitted.) The

*Guevara* rule is limited to those situations where the police have information that accomplices of an arrestee are at large. It has its natural stopping point where no accomplices are suspected or where all known accomplices have been apprehended previously.

Appellant relies on the recent case of *Arizona v. Hicks*, 480 U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), in support of his contention that the search of his basement and seizure of his jumpsuit were unlawful. His reliance is misplaced.

In *Hicks*, police lawfully entered the accused's apartment without a warrant pursuant to an exigent circumstance: a bullet had been fired through the floor of Hicks's apartment, striking and injuring a man in the apartment below. Police searched Hicks's apartment for the shooter, for victims, and for weapons. The police found and seized weapons and a stocking-cap mask. One officer then spotted two expensive stereos which seemed out of place in Hicks's otherwise squalid apartment. Acting on a "reasonable suspicion," the officer lifted the stereos and noted their serial numbers. When he contacted headquarters and reported his observations and findings, the officer was informed that the serial number on the stereos in Hicks's apartment corresponded to the numbers of stereos recently stolen. The stereos were then seized.

The Supreme Court held that the search and seizure of the stereos were illegal because they were not supported by probable cause. Even if police officers are lawfully in a home, the search and seizure of items in plain view must be supported by probable cause.

It is appellant's contention that the basement search in the case *sub judice*, not being supported by probable cause, is illegal under *Hicks* because, although the officers knew that appellant's accomplice was at large, they did not have probable cause to believe that the accomplice was in the basement. We think appellant misinterprets *Hicks*.

■ *Hicks* holds that searches and seizures of items found *pursuant to the plain view doctrine* must be supported by probable cause to believe that they are subject to seizure as contraband or evidence or fruits of crime. The plain view doctrine *presupposes* the legality of the officer's presence on the premises. In the case *sub judice* the issue is the legality of the officer's presence in the basement, there being no contention that the officer had no probable cause to seize the red jogging suit which was in plain view once he entered the basement. *Hicks,* therefore, is inapposite.

Appellant also cites *Dillon v. Superior Court of Santa Barbara County,* 7 Cal.3d 305, 102 Cal.Rptr. 161, 497 P.2d 505 (1972). In *Dillon,* police observed marijuana growing in appellant's backyard. The officer arrested appellant in the backyard, then entered her home to search for others suspected of growing the plants. The search was held to be unlawful because the police had no probable cause to believe other suspects were in the house at the time of the arrest. There is, nevertheless, some dicta in *Dillon* to the effect that even if the arrest had taken place *inside* the home the subsequent search for suspects would have violated the Fourth Amendment for lack of probable cause. It was pointed out in a dissent, however, that no probable cause was required in *Guevara.*

■ We believe that *Guevara* and the cases following *Guevara* are based on sound reason and logic. The Fourth Amendment prohibits *unreasonable* searches and seizures. Traditionally, the sanctity of a person's home—his castle—requires that the police may not invade it without a warrant except under the most exigent of circumstances. But once the police are lawfully within the home, their conduct is measured by a standard of reasonableness. They may not use the arrest of the suspect within his home as a pretext to search his house for evidence (*Chimel*), unless exigent circumstances make such a warrantless search reasonable (*Stackhouse*); nor may they even search and seize items in plain view unless there is probable cause to believe those

items are subject to seizure (*Hicks*). But as Professor La Fave pointed out, *supra*, if there is reason to believe that the arrestee had accomplices who are still at large, something less than probable cause—reasonable suspicion— should be sufficient to justify a *limited additional intrusion* to investigate the *possibility* of their presence.

We hold, therefore, that the court did not err in denying appellant's motion to suppress.

II  *Calling Appellant's Cousin as the Court's Witness*

Under Maryland law, the decision to call an individual to the stand as the court's witness lies within the sound discretion of the court and will not be overturned absent an abuse of discretion. *Scarborough v. State*, 50 Md.App. 276, 282, 437 A.2d 672 (1981), citing *Patterson v. State*, 275 Md. 563, 342 A.2d 660 (1975). The trial judge should consider the following facts when determining whether to call a court's witness:

> (1) the prosecutor's inability to vouch for the veracity or integrity of the witness; (2) the close relationship between the witness and the defendant; (3) the existence of contradictory or inconsistent statements by the witness; (4) the hostility of the witness; and (5) the necessity for the testimony, *i.e.*, where the witness possesses material evidence.

*Scarborough v. State, supra*, 50 Md.App. at 292, 437 A.2d 672. Nevertheless, it has been recognized that a "trial judge should call a witness as a 'court witness' only when the adversary system fails to produce the necessary facts and a miscarriage of justice would likely result." *Patterson, supra*, 275 Md. at 577, 342 A.2d 660. Also, as the Court of Appeals has noted, when "... a witness becomes the court's 'own witness' the judge must be scrupulously careful to preserve an attitude of impartiality and should never give the jury the impression he is of the opinion that the defendant is guilty." *Patterson, supra*, at 578, 342 A.2d 660 (citations omitted).

■ In the case *sub judice,* the court called Antonio Buie as a court's witness at the request of the State. The State could not vouch for Antonio Buie's veracity because he had given conflicting stories to the police and because he would not tell the State what his testimony under oath would be. The witness was closely related to appellant; he was appellant's cousin and was living with appellant on the day of the robbery.

The witness was clearly hostile; he had ignored the State's subpoena and was brought to court pursuant to a body attachment. Antonio Buie's testimony was material and important, although not crucial, to the State's case; he was one of two eyewitnesses to the armed robbery. Since Antonio Buie met all five of the criteria listed in *Patterson,* the trial court clearly did not abuse its discretion in calling him as its own witness.

■ Appellant further complains that the trial judge, after calling Antonio Buie to the stand, never examined him. Instead, the State and appellant's attorney each cross-examined appellant in turn. Appellant argues that the court's failure to examine its own witness deceived the jury into believing that Antonio Buie was the State's witness and in fact *made* Buie the State's witness, thus rendering the State's impeachment of him improper.

We do not agree. The trial judge clearly stated that he was calling Antonio Buie as the *court's* witness "in the interest of justice." It was clear that Antonio Buie was the court's witness, not the State's. Nor do we find fault with the trial judge's failure to examine the witness. The Court of Appeals has stated that when questioning a witness "the court should be careful to preserve an attitude of impartiality and against giving the jury an impression that the court was of the opinion that the defendant was guilty." *Patterson, supra,* at 579, 342 A.2d 660 (quoting *Gomila v. United States,* 146 F.2d 372, 374 (5th Cir.1944)). By declining to examine its own witness, the court avoided any appearance of partiality. There was no error.

**578**

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.