**Groves v. State, No. 2146 of the 2017 Term, Opinion by Moylan J.**

THE PROTECTIVE SWEEP INCIDENT TO ARREST: A HOMEGROWN PRODUCT – A. A NATIONAL PHENOMENON WITH A LOCAL PROVENANCE – B. THE PROTECTIVE SWEEP AS A "PRIOR VALID INTRUSION" – C. THE MEASURE OF CERTAINTY – D. THE MEASURE OF JUSTIFICATION IS REASONABLE SUSPICION – E. THE PURPOSE OF A SWEEP IS OFFICER PROTECTION – F. THE DEFINITION OF A PROTECTIVE SWEEP – G. THE GEOGRAPHY OF A PROTECTIVE SWEEP – H. THE SCOPE LIMITATIONS OF A PROTECTIVE SWEEP – I. REASONABLE SUSPICION IS OBJECTIVELY ASSESSED – J. THE TRIGGERING JUSTIFICATION NEED NOT END AT THE DOORSTEP – THE PROTECTIVE SWEEP IN THIS CASE

Circuit Court for Washington County
Case No. 21-K-17-053429

REPORTED

IN THE COURT OF SPECIAL APPEALS

 OF MARYLAND

No. 2146

September Term, 2017
_____

CURTIS LEE GROVES

v.

STATE OF MARYLAND
_____

Reed,
Friedman,
Moylan, Charles E., Jr.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Moylan, J.
_____

Filed: December 21, 2018

Our primary focus on this appeal is on the protective sweep as an incident of lawful arrest. The appeal is a primer of Fourth Amendment law because of the plenitude of issues it raises. On December 14, 2017, the appellant, Curtis Groves, entered conditional guilty pleas to 1) the possession of heroin with intent to distribute and 2) the possession of a firearm in a drug trafficking crime before Judge Mark K. Boyer in the Circuit Court for Washington County. On the two convictions, the appellant was sentenced to an aggregate term of 32 years of incarceration with all but 26 years suspended. The guilty pleas were conditioned upon the appellant's reserving his right to appeal from an adverse ruling at a pre-trial suppression hearing. Maryland Rule of Procedure 4–242(d)(2). Our chronology in this case looks backward from that point.

## The Suppression Hearing

Looking backward to the suppression hearing, the appellant moved pre-trial to suppress various contraband and instrumentalities of crime (to wit, drugs, a quantity of ammunition, and a handgun) seized by the police during a warranted search on January 25, 2017, of 43 Charles Street in Hagerstown, a residence shared by the appellant with his girlfriend, Sidrease Morgan. A hearing was conducted on the motion on November 29, 2017, before Judge Boyer. In an order of December 8, 2017, Judge Boyer denied the motion to suppress.

The key issue before the suppression hearing was the constitutionality of the search and seizure warrant for 43 Charles Street issued by Judge Daniel Dwyer on January 25, 2017. There was no question but that the detailed, eight-page warrant application submitted by Agent Tammy Jurado of the Washington County Narcotics Task Force facially

furnished abundant probable cause for the issuance of the warrant. The nub of the appellant's contention, however, was that the police had made an earlier entry into 43 Charles Street on that very day, to wit, when they first arrested the appellant, and had at that time made a number of visual observations which, in turn, became the essential core of the warrant application. The warrant application recited:

> In the process of arresting Groves, Corporal Will Blount of the Prince George's County Police Department and assigned to the Capital Area Regional Fugitive Task Force, observed to the right of the basement stairs a long box. Between the box and the basement wall he observed a brick shaped item lying on the dirt floor, which was wrapped in a layer of white paper and then in clear plastic.
>
> The brick shaped item appeared pliable, and based on Agent Jurado's knowledge, training and experience as a police officer, large amounts of controlled dangerous substances are often packaged in a similar manner for concealment, and prior to being broken down into smaller amounts for the purpose of distribution or dispensing.
>
> Deputy Chris Carson, also assigned to the Capital Area Regional Fugitive Task Force, observed in the basement an artificial Christmas tree box. Deputy Carson observed what is consistent with the black grip of a firearm protruding from the box. Deputy Carson also told Agent Jurado the basement wall is brick and one of the bricks had been removed and/or was missing. In the space where the brick should have been Deputy Carson observed a box of ammunition.
>
> Deputy Carson further advised that while clearing the residence to ensure there was no one else inside, he observed lying on the bedroom floor of a second floor bedroom what appeared to be a black semi-automatic handgun. This black semi-automatic handgun was lying next to the bed.

(Emphasis supplied).

The appellant's argument is that the unreasonable extent and duration of that earlier intrusion in the course of which the police made those observations violated the Fourth Amendment. The argument followed that if those unconstitutional observations, as fruit of

2

the poisonous tree, were excised from the warrant application, what then remained would not have been enough to justify the issuance of the warrant. With respect to that conditional quantitative assessment, the appellant is on solid ground. With respect to the constitutionality of the initial intrusion, however, we must look backward to the facts of that earlier event.

**The Protective Sweep Incident To Arrest:**
**A Homegrown Product**

## A. A National Phenomenon With A Local Provenance

Before turning to the application of protective sweep law to the specific facts of this case, however, it behooves us to examine protective sweep law in the abstract. It also is gratifying to remember that this now universally recognized constitutional principle grew from strong native roots. It was the 1987 opinion of Judge Theodore Bloom for the Court of Special Appeals of Maryland that found expression in the Supreme Court's first recognition of the protective sweep phenomenon in terms essentially indistinguishable from those first enunciated by Judge Bloom.

In Buie v. State, 72 Md. App. 562, 531 A.2d 1290 (1987), seven officers went to Buie's home in Prince George's County with an arrest warrant and arrested him for armed robbery. One officer called down basement stairs for everyone in the basement to come up with hands raised. After some discernible delay, Buie came up and was immediately arrested, handcuffed, and searched. As Buie was being led from the house, another officer went down into the basement "in case there was someone around." Id. at 566.

## B. The Protective Sweep As A "Prior Valid Intrusion"

What the officer found was a red jogging suit matching a description of the clothing worn by the armed robber. Pursuant to the Plain View Doctrine, it was seized and admitted into evidence. If the police entrance into the basement to conduct the protective sweep was reasonable, there was no disputing the fact that the warrantless seizure of the red jogging suit was also reasonable. The sweep into the basement was the Plain View Doctrine's "prior valid intrusion." The police had probable cause to believe that the red jogging suit, spotted in plain view, had been worn by the robber and was evidence of crime. Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); Arizona v. Hicks, 480 U.S. 321, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987).

The Task Force did not immediately or warrantlessly seize the contraband or other evidence which they observed in the course of the protective sweep. They simply included these observations in their application for a search warrant. In the meantime they placed a guard on 43 Charles Street, effectively seizing the property while they obtained the warrant. Illinois v. McArthur, 531 U.S. 326, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001); Segura v. United States, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984).

## C. The Measure Of Certainty

The key issue before this Court was one of first impression.

> Maryland has not previously determined whether, following the execution of an arrest warrant, officers may make a cursory inspection of the premises where the arrest took place to search for other known suspects[.]

72 Md. App. at 572 (emphasis supplied).

Holding that only reasonable suspicion and not probable cause is the measure of certainty that must be satisfied, Judge Bloom concluded:

> [I]f there is reason to believe that the arrestee had accomplices who are still at large, <u>something less than probable cause—reasonable suspicion—should be sufficient to justify a limited additional intrusion to investigate the possibility of their presence</u>.

72 Md. App. at 576 (some emphasis supplied).

A splintered Court of Appeals, by a four-to-three vote, reversed the decision of this Court and held that probable cause rather than reasonable suspicion was the appropriate measure of certainty required. <u>Buie v. State</u>, 314 Md. 151, 550 A.2d 79 (1988). The only difference between the conclusion of the Court of Appeals and that of the Court of Special Appeals was with respect to the measure of certainty—probable cause versus reasonable suspicion—required to justify a protective sweep. The Supreme Court granted certiorari and reversed the Court of Appeals's decision. <u>Maryland v. Buie</u>, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).

**D. The Measure Of Justification Is Reasonable Suspicion**

That measurement became, in turn, the primary focus of the Supreme Court.

> In this case <u>we must decide what level of justification is required</u> by the Fourth and Fourteenth Amendments <u>before police officers</u>, while effecting the arrest of a suspect in his home pursuant to an arrest warrant, <u>may conduct a warrantless protective sweep of all or part of the premises.</u>

494 U.S. at 327 (emphasis supplied).

After analogizing the question for decision to that before the Court in <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and <u>Michigan v. Long</u>, 463 U.S.

1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), the Supreme Court articulated both the standard and the test:

> We conclude that by requiring a protective sweep to be justified by probable cause to believe that a serious and demonstrable potentiality for danger existed, the Court of Appeals of Maryland applied an unnecessarily strict Fourth Amendment standard. <u>The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief</u> based on specific and articulable facts <u>that the area to be swept harbors an individual posing a danger to those on the arrest scene.</u> We therefore vacate the judgment below and remand this case to the Court of Appeals of Maryland for further proceedings not inconsistent with this opinion.

494 U.S. at 336–37 (emphasis supplied).

### E. The Purpose Of A Sweep Is Officer Protection

The analogy to <u>Terry v. Ohio</u> and to <u>Michigan v. Long</u> is the very core of the <u>raison d'être</u> for the protective sweep in <u>Buie</u>. All three cases serve precisely the same purpose—officer safety. They do so in the respective contexts of 1) a <u>Terry</u> stop on the street, 2) a <u>Terry</u> stop on the open road, and 3) an arrest in a home. That is why, of course, they share precisely the same triggering quantitative authorization—<u>Terry</u> reasonable suspicion. The protective sweep, therefore, does not in any way look for evidence of crime. Its exclusive purpose is to look for potentially armed and dangerous persons, who might harm the officers.

### F. The Definition Of A Protective Sweep

The Supreme Court's <u>Buie</u> opinion, at its outset, gave us an effective "nutshell" definition of the protective sweep.

> A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or

others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.

494 U.S. at 327.

## G. The Geography Of A Protective Sweep

The geography of the protective sweep is interesting. Security measures in a very limited area are automatically available as an incident of lawful arrest in a home—a bright line formula. Justice White's opinion in <u>Buie</u> pointed out:

> We also hold that as an incident to the arrest <u>the officers</u> could, as a precautionary matter and <u>without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest</u> from which an attack could be immediately launched.

494 U.S. at 334 (emphasis supplied).

It is only as the protective sweep then moves outward from that central core that justification, at the reasonable suspicion level, becomes necessary.

> <u>Beyond that</u>, however, we hold that <u>there must be articulable facts which,</u> taken together with the rational inferences from those facts, <u>would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.</u> This is no more and no less than was required in <u>Terry</u> and <u>Long</u>, and as in those cases, we think this balance is the proper one.

<u>Id</u>. (Emphasis supplied; footnote omitted).

## H. The Scope Limitations Of A Protective Sweep

The <u>Buie</u> opinion also carefully pointed out the scope limitations—in terms of both space and time—that circumscribe the protective sweep.

> We should emphasize that such <u>a protective sweep</u>, aimed at protecting the arresting officers, if justified by the circumstances, <u>is</u> nevertheless <u>not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep</u>

7

> lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

494 U.S. at 335–36 (emphasis supplied; footnote omitted).

## I. Reasonable Suspicion Is Objectively Assessed

Judge McAuliffe, who had been in dissent when the Buie case was first before the Court of Appeals, wrote the majority opinion for that Court on remand from the Supreme Court. The Court of Appeals was again split, four to three with one of the four, moreover, Judge Chasanow, simply concurring in the result. On remand, the Court of Appeals had to determine whether the standard for measuring reasonable suspicion was subjective or objective.

> [W]e must first determine whether the presence of "reasonable suspicion" must be tested from the view of the particular police officers involved, or from the view of a reasonable police officer under the same circumstances, or a combination of the two. Buie argues the State must show that the officers had a subjective belief that there was a dangerous individual in the basement, and that this belief must have been objectively reasonable. The State insists an objectively reasonable belief is sufficient.

Buie v. State, 320 Md. 696, 699, 580 A.2d 167 (1990) (emphasis supplied).

The reason for uncertainty was that the Supreme Court's opinion had been less than crystal clear in that regard.

> From the Supreme Court's Buie, it is not easy to tell whether the established standard is subjective or objective.

Id.

The Court of Appeals then opted for the objective standard.

> We conclude that in determining the existence of reasonable suspicion in a case such as this, the objective standard must be used. The Supreme

8

Court in this case spoke specifically of the use of an objective standard when it said "[t]his is no more and no less than was required in <u>Terry</u> and <u>Long</u> . . . ." <u>Maryland v. Buie</u>, 110 S. Ct. at 1098. The experience and training of the particular police officers involved will form a part of the matrix of facts that define the circumstances which must be considered, but <u>the test is whether a reasonably prudent police officer, under those circumstances, is justified in forming a reasonable suspicion that the house is harboring a person posing danger to those on the arrest scene.</u>

320 Md. at 702 (emphasis supplied; footnote omitted).[1]

## J. The Triggering Justification Need Not End At The Doorstep

The post-<u>Buie</u> caselaw has been scarce. As the State points out in its brief, "It appears that the only reported Maryland case since <u>Buie</u> that analyzes a protective sweep in any detail is <u>Murphy v. State</u>," 192 Md. App. 504, 995 A.2d 783 (2010). The primary issue for decision in <u>Murphy</u> was that of whether, all other requirements having been satisfied, a protective sweep would be disallowed because the arrest that triggered it had occurred immediately outside a residence rather than literally within it. The <u>Murphy</u> opinion posed the issue:

> Here, by contrast, appellant and the other occupants were arrested outside the apartment. <u>Appellant argues that, because the arrest here occurred outside the residence</u>, "the officers were not placed at risk of being 'ambushed' by another suspect on the premises, and <u>there was no rationale for performing a 'protective sweep [of the apartment].'"</u>

192 Md. App. at 513–14 (emphasis supplied).

---

[1] CAVEAT: Because the decision of the Court of Appeals was only made pursuant to a four-to-three vote and because one of the prevailing four simply concurred in the majority decision but not the majority opinion, some lingering doubt might be deemed to remain.

Judge Graeff surveyed the national caselaw, federal and state, and found that seven United States Courts of Appeal had unanimously held that the locus of the arrest, just outside rather than inside the residence, would not preclude a protective sweep. She quoted with approval United States v. Lawlor, 406 F.3d 37, 42 (1st Cir. 2005):

> We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene.

192 Md. App. at 514–15 (emphasis supplied). See also United States v. Wilson, 306 F.3d 231, 239 (5th Cir. 2002) ("[N]othing but an open door stood between the officers . . . and harm's way."); United States v. Paopao, 469 F.3d 760 (9th Cir. 2006); United States v. Cavely, 318 F.3d 987 (10th Cir. 2003); United States v. Colbert, 76 F.3d 773 (6th Cir. 1996); United States v. Henry, 48 F.3d 1282 (D.C. Cir. 1995); United States v. Oguns, 921 F.2d 442 (2d Cir. 1990). The states that have dealt with the issue have followed suit. State v. Spencer, 268 Conn. 575, 848 A.2d 1183 (2004); State v. Grossi, 72 P.3d 686 (Utah Ct. App. 2003); State v. Revenaugh, 133 Idaho 774, 992 P.2d 769 (1999); People v. Maier, 226 Cal. App. 3d 1670 (1991).

In line with that precedent, Judge Graeff's opinion for this Court concluded:

> We agree with the consensus of other courts that the reasonableness of a protective sweep of a residence incident to arrest does not turn on whether the arrest occurred inside or outside the residence. An arrest that occurs outside a residence can pose a threat to arresting officers that is equally as serious as when the arrest occurs inside the residence.

192 Md. App. at 517 (emphasis supplied).

**The Protective Sweep In This Case**

The circumstances surrounding the arrest of the appellant at 43 Charles Street in Hagerstown on January 25, 2017, were such that they could, we hold, objectively have created in a police officer a reasonable trepidation that an armed confederate might have been lurking in the shadows, especially in the basement.

The appellant was being hunted by the United States Marshals Service/Capital Area Regional Fugitive Task Force, in cooperation with the Hagerstown Department of Police. In May of 2003, the appellant had been convicted in the State of New York, on his guilty plea, of the criminal possession of marijuana in the 5th degree. A month later, in June of 2003, the appellant had been convicted again in New York, on his guilty plea, to the criminal possession of a controlled substance. In October of 2010, the appellant was again convicted in New York of the criminal possession of a loaded firearm. In January of 2017, the Task Force was looking for the appellant to arrest him on an active Violation of Parole warrant issued for him by New York State. The violation of parole leading to the issuance of that retake warrant was a firearms violation.

In the Fall of 2016, Agent Frank Toston of the Washington County Narcotics Task Force had received information that the appellant was in Hagerstown and was selling and distributing narcotics. The information was that the appellant frequented the area of John Street and North Mulberry Street. The source of information indicated, moreover, that the appellant was "always in possession of a handgun."

The suppression hearing was conducted on November 29, 2017, before Judge Boyer, with five members of the Task Force testifying for the State and no one for the

defense. Judge Boyer filed his opinion and his Order of Court, denying the appellant's motion, on December 8, 2017. Judge Boyer made extensive findings of fact, which findings were supported by the testimony of the Task Force officers. Those findings of fact were not clearly erroneous. Indeed, they were not even controverted. We accept them as the unassailable factual bases for assessing the present appeal.

At the suppression hearing, the appellant conceded that the New York parole retake warrant for his arrest was valid. The appellant further conceded that the entry of the Fugitive Task Force arrest team into 43 Charles Street on January 25, 2017, was also valid. The only issue in dispute was the justification for the protective sweep into the basement immediately following the appellant's arrest.

Based on the testimony of Detective John Anthony Moriarty of the Montgomery County Police Department, assigned to the U.S. Marshal's Capital Area Regional Fugitive Task Force, Judge Boyer made the following findings:

> During the hearing Detective Moriarty testified that upon arrival at the residence the arrest team did not receive a response to their knock on the door of 43 Charles. They then made contact with a Ms. Brown at 41 Charles Street, the adjoining side of the duplex, who indicated that her daughter, teenaged granddaughter, and the Defendant (her daughter's boyfriend) resided in 43 Charles. Ms. Brown was able to place a call to her daughter, which resulted in Sidrease Morgan [the girlfriend] coming to the door at 43 Charles.

> Ms. Morgan confirmed that the Defendant was inside of 43 Charles, but was unsure whether he was upstairs or downstairs. She also indicated that her child was not in school that day and was likewise in the residence. When questioned, Ms. Morgan indicated she had seen the Defendant in possession of a firearm, but not for about a week. She also confirmed the gang-related

12

information that the arrest team already knew, indicating that the Defendant was a "Blood from Harlem." [2]

(Emphasis supplied).

The next witness was Deputy Ryan Lee of the Montgomery County Sheriff's Office, also assigned to the U.S. Marshal's Task Force. Deputy Lee had been a law enforcement officer for 18 years and had been working with the Task Force for 12 years. Based upon his testimony, Judge Boyer made the following findings of fact.

> Deputy Lee testified that he was the "shield guy" and first to enter 43 Charles Street. He initially called out for the Defendant, but when he received no reply he led the team of approximately ten into the residence, entering the living room. He continued through the living room to the kitchen, where he again called out several times with no response.

> Deputy Lee located an open stairway off the kitchen which led to the basement. Having received no response, he kicked a bottle down the basement steps in the hope of getting a reaction. At that time, Lee heard fumbling around in the basement and continued to call out, with no response.[3]

> After about two minutes, the Defendant showed himself at the bottom of the basement steps. The Defendant was then instructed to come up the steps, but he initially just stared. After further commands, the Defendant came part way up the steps, but no further. Members of the arrest team then went down the steps and took him into custody, walking him to the kitchen. At this point Deputy Lee indicated he was still "holding" the stairwell in case others may be downstairs.

---

[2] See United States v. Winston, 444 F.3d 115, 119 (1st Cir. 2006) ("Winston was a potentially dangerous drug dealer who had recently purchased a bullet-proof vest and firearms and had numerous, potentially armed and dangerous cohorts.").

[3] See United States v. Alatorre, 863 F.3d 810, 814–15 (8th Cir. 2017), in which a sweep was upheld in a case where the defendant had a history of violence and was potentially armed and where the officers heard notices in the house which "created a reasonable uncertainty as to how many people were inside the residence."

(Emphasis supplied).

The next witnesses to testify were Deputy United States Marshal Chris Carson of the Greenbelt Office and Detective William Blount of the Prince George's County Police Department, who had been assigned to the Task Force for the past six years. Based on their combined testimony, Judge Boyer made the following findings:

> As the arrest team was entering 43 Charles, contact was made with Ms. Morgan's teenage daughter. Deputy Marshal Carson testified that as the child was passed out of the house by the arrest team, she replied to the officers that she didn't know if anyone else was in the house.[4]
>
> . . . .
>
> Deputy U.S. Marshal Carson testified that "just after [the Defendant] was in custody" the team conducted a protective sweep of the house. Deputy Lee testified that a sweep of the second floor, where noises were heard, took five minutes. Then Carson and Detective Blount entered the basement "to make sure no one else was down there." Carson described the basement as being "fairly open" and characterized his actions as making "quick visual scans" while "just looking behind large items." There was no testimony that anything was moved or opened during the protective sweep of the basement.
>
> While conducting the protective sweep of the basement, the testimony and exhibits indicate that the basement was somewhat dark and the officers needed to use their flashlights. On one side of the basement Carson observed a black object in plain view sticking out of a Christmas tree box which resembled a handgun, as well as a box of ammunition, clearly visible about chest high in the brick wall where a brick was missing. On the other side of the basement, Blount observed a rectangular package, wrapped in plastic which he believed to be illegal narcotics. This was observed in plain view to the side of yet another Christmas tree box near a wall.

---

[4] See United States v. Virgil, 444 F.3d 447, 451 (5th Cir. 2006), a case wherein a protective sweep was upheld where police heard sounds coming from the rear of the residence and where the defendant stated that he did not know if anyone else was inside the home.

The officers did not seize any of the items observed, but their observations were included in the application for search warrant which was later issued and executed at 43 Charles Street.

(Emphasis supplied).

Based upon his findings of fact, Judge Boyer ruled as follows:

Based upon the totality of the circumstances, the Court finds that it was reasonable for the officers to conduct a protective sweep of the basement and the second floor of 43 Charles Street. The sweep, which the officers testified is part of their standard protocol to ensure officer safety, occurred nearly contemporaneously with the arrest while the Defendant was still in the living room. The basement was immediately adjoining the place of the Defendant's arrest and in fact was where he was hiding from the arrest team. Furthermore, the sweep was de minimis, not overly intrusive, and limited to confirming that no one else was present in the house who may have posed a danger to the officers.

The facts known to the arrest team at the time they conducted the protective sweep support its necessity. The Defendant had an active parole retake warrant, was known to be armed in the past, was known to be a gang member, and had secreted himself in a dark basement, initially refusing to respond or submit. These facts, coupled with the uncertainty of knowing who else may be the house warranted the conduct of the protective sweep by the officers.[5]

The plain view observations of the officers made during the protective sweep are valid and not violative of the protections afforded by the 4th Amendment. Therefore, the search warrant issued, based in part upon those observations, is likewise valid especially in light of the Defendant's status as a parolee with an active, outstanding parole retake warrant.

(Emphasis supplied).

---

[5] See Sutterfield v. City of Milwaukee, 870 F. Supp. 2d 633, 640 (E.D. Wis. 2012), aff'd, 751 F.3d 542 (7th Cir. 2014) ("[A] police officer can be heard asking whether there are any other individuals in the house, to which there is no response. Further, the police officers were under the (correct) impression that Ms. Sutterfield owned a gun, making a firearm likely present in the home.").

15

We affirm that ruling. The protective sweep did not violate the Fourth Amendment. The cursory observations made in the course of the protective sweep, therefore, were properly included in the application for the search warrant for 43 Charles Street. The motion to suppress was properly denied.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**